# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

J. DAWN ISON,                                    Case No. 1:11-cv-470
    Plaintiff,                          Dlott, C.J.
                     Litkovitz, M.J.

      vs

COMMISSIONER OF                                  **REPORT AND**
SOCIAL SECURITY,                                 **RECOMMENDATION**
    Defendant.

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications

for disability insurance benefits (DIB) and supplemental security income (SSI). This matter is

before the Court on plaintiff's Statement of Errors (Doc. 9), the Commissioner's response in

opposition (Doc. 12), and plaintiff's reply. (Doc. 13).

## I. Procedural Background

Plaintiff filed applications for DIB and SSI in November 2005, alleging disability since

February 4, 2003, due to a cervical spine injury. (Tr. 80-82, 146). Plaintiff's applications were

denied initially and upon reconsideration. Plaintiff, through counsel, requested and was granted

a de novo hearing[1] before administrative law judge (ALJ) Thomas R. McNichols II. Plaintiff

and a vocational expert (VE) appeared and testified at the two ALJ hearings. On September 24,

2009, the ALJ issued a decision denying plaintiff's DIB and SSI applications. Plaintiff's request

---

[1] An initial hearing was held on March 24, 2009, but the ALJ continued the hearing to obtain a more recent medical opinion regarding plaintiff's physical impairments. (Tr. 972-1001). The hearing was completed on September 10, 2009, after plaintiff underwent a consultative evaluation with an orthopedic specialist. (Tr. 1002-26).

for review by the Appeals Council was denied, making the decision of the ALJ the final

administrative decision of the Commissioner.

## II. Medical Evidence

### A. Mental Impairments

On June 18, 2003, plaintiff underwent a consultative evaluation with psychologist David

Chiappone, Ph.D. (Tr. 254-57). Plaintiff related a history of physical and sexual abuse and

familial mental health issues. (Tr. 254-55). Plaintiff reported that she experienced ongoing

physical pain due to a back injury; had a history of substance abuse; and was currently in a

depressed state marked by crying spells and a feeling of hopelessness. (Tr. 255-56). Dr.

Chiappone diagnosed plaintiff with a history of polysubstance abuse, in remission but with

ongoing alcohol and marijuana dependency; a mood disorder – NOS; a personality disorder –

NOS; and assigned her a Global Assessment of Functioning (GAF) score[2] of 69. (Tr. 257). Dr.

Chiappone opined that plaintiff was able to understand and remember simple one and two-step

job instructions; maintain concentration and attention; and relate to co-workers, supervisors and

the public. *Id*. Dr. Chiappone further opined that plaintiff was mildly impaired in her ability to

carry out these tasks due to depression; mildly impaired in her ability to deal with stress; and

incapable of doing these tasks or managing her funds due to substance abuse. *Id*.

_____

[2] A GAF score represents "the clinician's judgment of the individual's overall level of functioning."
American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, p. 32 (4th ed., text rev.
2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social,
and occupational functioning." (*Id*.). The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger
of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act
with clear expectation of death). *Id*. at 34. The DSM-IV categorizes individuals with scores of 51-60 as having
"moderate" symptoms. (*Id*.). The DSM-IV categorizes individuals with GAF scores of 61 to 70, as having "some
mild" symptoms who are "generally functioning pretty well." *See* DSM-IV at 32.

2

In August 2003, non-examining psychologist Bruce J. Goldsmith, Ph.D., opined that plaintiff had mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 293-305). This assessment was affirmed by Joan P. Williams, Ph.D., on December 17, 2003. (Tr. 293).

October 2004 to December 2004 treatment notes from Samaritan Behavioral Health include plaintiff's reports of depression, anxiety, difficulty concentrating, mood swings, marijuana and alcohol abuse, and difficulty sleeping. (Tr. 362-87). Plaintiff was initially diagnosed with bipolar disorder and depression and assigned a GAF score of 40. (Tr. 370). At a later session, however, plaintiff was diagnosed with a mood disorder due to her chronic pain and assigned a GAF of 60. (Tr. 374). In October 2005, plaintiff was also diagnosed with post-traumatic stress disorder and noted as having a flat, sad/depressed, and hopeless affect. (Tr. 510, 514). However, plaintiff's mood seemed to improve as November 15, 2005 treatment notes described her as having a normal, appropriate, stable, and calm affect (Tr. 507) and November 29, 2005 notes describe her as being happy and playful with a sense of humor. (Tr. 503).

On March 16, 2006, non-examining agency psychologist Alice Chambly, Psy. D., completed a mental residual functional capacity (RFC) assessment based on her review of plaintiff's treatment history. (Tr. 622-41). Dr. Chambly identified that there was insufficient evidence to evaluate plaintiff's condition for the period of December 31, 2003 to October 18, 2004 and, thus, her opinion was limited to the period of October 18, 2004 to March 2006. (Tr. 626). Dr. Chambly noted that plaintiff had limited daily activities and that the evidence

3

demonstrated an improvement in her mood since being in therapy, as well as a reduction in her anger and frustration. *Id.* Dr. Chambly diagnosed plaintiff with bipolar disorder and opined that plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 638). Dr. Chambly further opined that plaintiff was capable of completing simple repetitive tasks in a low stress work environment and recommended that she be limited to work in environments with minimal contact with others due to her current levels of frustration and socialization. (Tr. 626). This assessment was affirmed by Dr. Goldsmith on January 4, 2007. (Tr. 621).

January 2006 to February 2007 treatment notes from Samaritan Behavioral Health include reports that plaintiff's mood varied from feelings of irritability, anger, and depression to happiness, confidence, and increased energy. (Tr. 651-714). In January and February 2006, plaintiff reported that she was doing well, that her pain was manageable, and that trigger point injections had helped significantly. (Tr. 707, 713).

The record further documents that plaintiff received prescriptions for Zoloft, Prozac, Ambien, Effexor, Trazodone, Seroquel, Cymbalta, and Valium. (Tr. 513, 525, 532, 652, 747).

### B. Physical Impairments

On February 7, 2003, plaintiff reported to the Good Samaritan Hospital emergency room for complaints of left shoulder and elbow pain. (Tr. 247-53). Examination revealed tenderness and limited range of motion in the left shoulder and x-ray results showed mild widening of the acromioclavicular joint, possibly chronic in nature, and no fracture. (Tr. 250-51, 252). Plaintiff

4

was instructed to take anti-inflammatory drugs and was noted as being disappointed that she was not given pain medicine. (Tr. 249, 251).

Plaintiff returned to Good Samaratan Hospital for follow-up care from February 12 to June 26, 2003. (Tr. 258-76). Plaintiff reported pain and examination findings included limited range of motion in her spine (Tr. 267) and 5/5 strength bilaterally except for the left triceps which was 4/5. (Tr. 268). A March 21, 2003 MRI of plaintiff's cervical spine revealed no acute compression deformity, diffuse annular bulges at C3-4, C4-5, C5-6, and a focal disc protrusion at C6-7. (Tr. 265-66). An electromyography (EMG) study was abnormal, evidencing acute left C7 cervical radiculopathy and very mild left carpal tunnel syndrome (Tr. 268) and an x-ray of plaintiff's cervical spine revealed moderate reversal of cervical lordosis and a mild end plate bony spur in the mid and lower cervical spine due to degenerative change. (Tr. 275). Enrique Martinez, M.D., an orthopedic specialist at Good Samaritan, diagnosed plaintiff with cervical spine arthritis with foraminal changes and reported that this condition limited plaintiff's spinal range of motion and that plaintiff walked with a stiff gait and had loss of sensation in her hands. (Tr. 261-62).

Physical therapy records from February and March 2003 include reports that plaintiff had made progress during therapy but that she did not complete the program. (Tr. 318-19).

On June 30, 2003, Gary Ray, M.D., conducted a consultative examination to evaluate plaintiff's neck and upper extremity pain. (Tr. 277-83). Examination revealed that plaintiff: could ambulate short distances and heel-toe walk without difficulty; had decreased sensation in her left forearm, but otherwise normal sensation; demonstrated no difficiulty grasping and

5

manipulating with the right hand, but some difficulty with the left; had tenderness in the midline and right greater than left in the cervical paraspinals areas; had no muscle spasms; had mild crepitation with motion of the knees; and presented with no joint abnormalities. (Tr. 278). Dr. Ray diagnosed plaintiff with cervical disc bulging as well as a C6-7 left disc protrusion likely resulting in a left cervical radiculitis or radiculopathy. *Id.* Dr. Ray opined that plaintiff was able to lift and carry up to 10 pounds; should avoid overhead reaching; was unlimited in her abilities to sit, stand, walk, bend, stoop, or partially squat; should avoid crawling and climbing; and should avoid forceful activities using the left hand. (Tr. 278-79).

MRIs of plaintiff's cervical spine from July 11 and 23, 2003 revealed moderate multilevel disc dessication with mild disc height loss from C4-5 through C6-7, reversal of cervical lordosis from C5 through C7 with mild cervical kyphosis, mild diffuse disc bulge without significant central or foraminal stenosis at C2-3, minimal diffuse spondylosis without cord compression or foraminal stenosis, moderate multilevel cervical spondylosis with moderate to large left disc herniation at C6-7 causing markedly severe left C7 foraminal stenosis, moderate lateral cord compression and mild to moderate central stenosis, and moderate to severe right C6 foraminal stenosis (Tr. 288-89), and mild-to-moderate degenerative changes, most significant at C4-C5 and C5-C6 levels with retrolisthesis noted at C5-C6. (Tr. 286).

On August 13, 2003, Myung J. Cho, M.D., a non-examining physician, reviewed plaintiff's medical treatment, including opinions from plaintiff's treating physician and objective findings, and provided an RFC assessment. (Tr. 306-11). Dr. Cho opined that plaintiff had the physical RFC to lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk about

six hours in an eight-hour workday; sit about six hours in an eight-hour workday; and engage in limited pushing and pulling with her left upper extremity. (Tr. 308). Dr. Cho further opined that plaintiff had limited fingering and manipulation abilities; could occasionally climb ramps and stairs; never balance; never climb ladders, ropes, or scaffolds; and occasionally crawl. (Tr. 309-10). This opinion was affirmed on December 18, 2003 by Lynn B. Torello, M.D. (Tr. 311).

In December 2003, non-examining agency doctor Dr. Torello provided a new RFC assessment based on plaintiff's request for reconsideration due to new evidence. (Tr. 312-17). Dr. Torello's opinion largely mirrored that of Dr. Cho; however, she opined that plaintiff was further limited to only occasional stooping. (Tr. 315).

January to February 2004 physical therapy records from Spectrum Rehabilitation indicate that plaintiff was non-compliant with therapy and/or declined to continue treatment. (Tr. 325-31).

A February 19, 2004 MRI of plaintiff's thoracic spine revealed a small disc herniation at T7-8, degenerative disc disease at multiple levels, but no cord compression was noted. (Tr. 350). MRIs of plaintiff's lumbar and cervical spine revealed moderate central and left foraminal stenosis at L4-5 secondary to facet joint hypertrophy and multi-level cervical spondylosis, most pronounced at C5-6. (Tr. 351-52).

Plaintiff was evaluated by Townsend Smith, M.D., on June 24, 2004 for neck and upper extremity pain management. (Tr. 333-35). Dr. Smith noted 5/5 upper and lower extremity muscle strength; 2+ reflexes bilaterally with normal sensation to light touch; diffuse pain over the cervical neck in the trapezius area; and diffuse pain over the mid thoracic and cervical spine.

(Tr. 334).  Dr. Smith noted that the recent MRIs did not show gross cord compression and opined that plaintiff's pain was caused by cervical myofascial pain syndrome status post trauma and cervical spondylosis.  (Tr. 333).

On October 18, 2004, plaintiff underwent a MRI of her cervical spine which revealed degenerative changes in the form of disc space narrowing, end plate spurring and mild malalignment likely related to ligamentous laxity.  (Tr. 361).

Oscar Cataldi, M.D., completed a physical functional capacity assessment based on his treatment of plaintiff in October and November 2004.  (Tr. 419).  Dr. Cataldi opined that plaintiff was able to frequently lift five pounds; occasionally lift/carry up to ten pounds; stand two hours, one hour uninterrupted; and sit three hours, one hour uninterrupted, in an eight-hour workday. *Id.*  Further, Dr. Cataldi opined that plaintiff was not significantly limited in her ability to bend or handle; moderately limited in her ability to see; and markedly limited in her ability to push/pull, reach, or do repetitive foot movements.  *Id.*  Dr. Cataldi noted that his opinion was based solely on plaintiff's subjective reports and that he believed these impairments were expected to last nine to 11 months.  *Id.*

On February 9, 2005, plaintiff was evaluated by Scott West, D.O., a neurosurgeon.  (Tr. 389-91).  Dr. West reported that plaintiff had palpable tenderness in the posterior cervical musculature, limited spinal range of motion, intact and equal motor function, decreased reflex at ¼ and equal bilaterally in the upper extremities, and sensory deficits in all fingers of both hands. (Tr. 389).  Based upon his examination and review of plaintiff's November 2004 MRI, Dr. West diagnosed plaintiff with cervical spondylosis C5-6 and C6-7.  *Id.*  Dr. West opined that plaintiff's

8

condition was not severe enough to warrant surgery and suggested conservative care, prescribing physical therapy and Tylenol #3. (Tr. 390).

A September 30, 2005 MRI of plaintiff's cervical spine revealed multilevel degenerative disc disease without focal disc herniation and uncovertebral joint degenerative joint disease at the C5-6 and C6-7 levels with neural foraminal narrowing. (Tr. 459).

On April 28, 2006, non-examining agency physician, James Gahman, M.D., completed a physical RFC assessment. (Tr. 643-50). Dr. Gahman based his opinion on a review of treatment notes from July 2005, the November 2004 MRI, and results from a 2003 EMG; Dr. Gahman's review did not include the opinion of a treating source. (Tr. 644, 649). Dr. Gahman determined that plaintiff could occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand/walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes, or scaffolds; and had no limits in her ability to push/pull. (Tr. 644-43). Further, Dr. Gahman opined that plaintiff was limited in her ability to reach but had no other manipulating or fingering limitations. (Tr. 646).

In October 2006 plaintiff underwent another MRI of her thoracic spine which demonstrated moderate to severe posterior disc protrusion at T7-T8 resulting in moderate focal canal stenosis without significant evidence of cord abutment and multilevel mild degernative disc changes. (Tr. 562-63). October 2006 MRIs of plaintiff's shoulders revealed a large supraspinatus tendon tear with the appearance of chronicity and marked joint space narrowing in

the subacromial space in her left shoulder (Tr. 564) and, in her right shoulder, a large

supraspinatus tear which appears to be a chronic rotator cuff tear.  (Tr. 566).

November 2004 to November 2008 treatment records from Laila Gomaa, M.D.,

plaintiff's primary pain management physician, include findings of normal upper and lower

extremity reflexes (Tr. 426, 479-80); positive straight leg raise test, right (Tr. 426); muscle

spasms in the trapezius, lumbar and gluteal areas (Tr. 455, 465, 570, 604); reduced range of

spinal motion (Tr. 455, 465) as well as normal range of spinal motion (Tr. 875); and tenderness

to palpation on the cervical and lumbar spine.  (Tr. 455, 465, 559, 604).  Further, these records

document plaintiff's trigger point injections.  (Tr. 429, 431, 435-37, 440, 442, 448, 548, 554,

556, 573, 577, 581, 613, 617, 836, 839, 842, 846, 849, 852).

An August 23, 2007 Re-Evaluation Report from Dr. Gomaa's office indicates that on

examination plaintiff had a normal gait; negative straight leg raise bilaterally; and muscle spasm

in the paravertebral-cervical area.  (Tr. 763-64).  No thoracic or lumbar spasms were noted and

there was no tenderness on palapation in the cervical, thoracic, or lumbar regions.  (Tr. 768).

Plaintiff was directed to restrict her physical activities as follows: no carrying objecting over five

pounds; only intermittent carrying of objects under 10 pounds; no pulling heavy objects over 10

pounds; no repetitive movements of the neck and upper and lower back; avoid twisting lower

back over 30 degrees; avoid bending over 45 degrees; avoid reaching over ahead; and allow

frequent position changes.  (Tr. 765).  Similar findings were reported at a November 2008

evaluation, except plaintiff's gait was noted as being slow and stiff.  *See* Tr. 826-28

On February 5, 2008, Dr. Gomaa completed a physical RFC assessment. (Tr. 815-19). Dr. Gomaa opined that plaintiff can occasionally lift/carry ten pounds; frequently lift/carry five pounds; stand and walk for a total of two hours a day, fifteen minutes without interruption; sit for a total of four hours a day, thirty minutes without interruption; occasionally stoop, kneel, and crouch; and never climb, balance, or crawl. She is limited in her abilities to push, pull and reach. Dr. Gomaa identified that plaintiff's disc displacements and rotator cuff tears formed the bases of her opinion. (Tr. 816-18).

Plaintiff underwent a cervical spine MRI on January 26, 2009. (Tr. 901). The MRI was consistent with previous findings, revealing lower cervical multilevel degenerative discovertebral changes and spondylosis with annulus bulging and endplate lipping, greatest on the left at the C6-C7 level where there was evidence of mild foraminal encroachment. *Id*.

On April 30, 2009, plaintiff was examined by consultative physician Aivars Vitols, D.O. (Tr. 935-49). Dr. Vitols reported that plaintiff exhibited a slow and stiff gait; tenderness in her back; but he was unable to detect spasm in the cervical spine due to exogenous obesity. (Tr. 937). Plaintiff was noted as having decreased strength in the left shoulder, 4/5; crepitus through her shoulder range of motion; restricted motion in the right shoulder but no loss of strength; intact biceps, triceps, and forearm reflexes; and weak pinch and grip in the left arm, but not the right. *Id*. Plaintiff was able to heel-toe walk; straight leg raise was negative in both legs; and there was full range of motion in both legs and ankles. *Id*. Dr. Vitols diagnosed plaintiff with left shoulder complete rotator cuff tear; cervical sprain and strain with cervical spondylosis and bulging disc C6-7; thoracic disc protrusion T7-T8 with degenerative disc disease; depression,

11

diabetes, and hypertension per plaintiff's reports; and exogenous obesity. (Tr. 938). Dr. Vitols opined that plaintiff does not have the residual capacities to carry on work-related activities and use of the left arm. *Id.* She is restricted to occasionally lifting five to 10 pounds with the left arm with no ability to use the left arm at or above shoulder height, and has a restricted ability to use the right arm above shoulder height. *Id.* Dr. Vitols further opined that plaintiff's ability to stand and walk is affected by degenerative disc disease and the disc protrusion of the thoracic spine and is restricted to standing/walking three hours out of an eight-hour workday, one hour without interruption, with no limits on plaintiff's ability to sit. (Tr. 938, 944).

A September 2009 MRI of plaintiff's lumbar spine revealed facet arthropathy from L3 through S1, severe from L4 through S2; annulus disc bulging from L4 through S1 and at T11-12 and T12-L1; but no disc herniations or spinal stenosis were noted. (Tr. 958).

## III. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

12

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.*; *Wilson* v. *Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

13

1. The claimant met the insured status requirements of the Social Security Act through December 31, 2006.

2. The claimant has not engaged in substantial gainful activity since February 4, 2003, the alleged disability onset date (20 C.F.R. 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: 1) chronic neck and low back pain; 2) chronic bilateral shoulder pain (worse on the left side); and 3) obesity (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the [ALJ] finds that the claimant has the residual functional capacity (RFC) to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) subject to: 1) occasional lifting of no more than five-to-ten pounds with the nondominant left hand; 2) standing and/or walking no more than six hours per eight-hour work day; 3) occasional stooping, kneeling, crouching, or crawling; 4) no twisting at the waist; 5) no balancing or climbing of ropes, ladders, or scaffolds; 6) no more than occasional climbing of stairs; 7) no more than occasional handling, fingering, or pushing/pulling on the left side; 8) no more than occasional use of foot controls; 9) no work above shoulder level; 10) no more than occasional exposure to vibrations; and 11) no requirement to maintain concentration on a single task for longer than fifteen minutes at a time.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[3]

7. The claimant was born [in] 1960 and was 42 years old, which is defined as a "younger individual" on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in

---

[3] Plaintiff has past relevant work as a circuit board inspector, a store manager, and as an editor. (Tr. 1000, 1019).

English, but there is no evidence that her education provides for direct entry into skilled work (20 CFR 404.1564 and 416.964).

9. The testimony of the vocational expert indicated that the claimant had skilled and semiskilled work experience but that her acquired work skills did not transfer to other skilled or semiskilled jobs due to her functional limitations; therefore, it is found that she has no transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from February 4, 2003, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-26).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In

deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545–46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

**D. Specific Errors**

On appeal, plaintiff raises two assignments of error: (1) the ALJ erred in failing to find that plaintiff had a severe mental impairment; and (2) the ALJ improperly weighed the medical opinions in the record and erred in formulating plaintiff's RFC. Specifically, plaintiff maintains that the ALJ erred in rejecting the opinion of Dr. Gomaa, plaintiff's treating specialist. Further, plaintiff asserts that the ALJ's RFC formulation, largely based on the opinion of Dr. Vitols, is flawed because it fails to account for Dr. Vitols opinion that plaintiff has no ability to carry on work related activities and use of the left arm.

1. The ALJ did not commit reversible error in determining that plaintiff does not have a severe mental impairment.

Plaintiff asserts the ALJ erred by not finding that she had a severe mental impairment at

Step Two of the sequential disability analysis. In support, plaintiff identifies that she consistently received mental health treatment from October 2004 through 2007 and that she continues to receive prescriptions for anti-depressant medications. Plaintiff also argues that Dr. Chambly's March 2006 diagnosis of bipolar disorder supports a finding that her mental impairment is severe. For the reasons that follow, the undersigned finds that the ALJ did not err in determining that plaintiff did not have a severe mental health impairment.

A severe impairment or combination of impairments is one which significantly limits the physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c). In the physical context, this means a significant limitation upon a plaintiff's ability to walk, stand, sit, lift, push, pull, reach, carry or handle. 20 C.F.R. §§ 404.1521(b)(1), 416.921(b)(1). In the framework for mental impairments, this involves, for example, limitations on a plaintiff's ability to understand, carry out, and remember simple instructions. 20 C.F.R. §§ 404.1521(b)(3), 416.921(b)(3). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting. 20 C.F.R. § 404.1521(b). Plaintiff is not required to establish total disability at this level of the sequential evaluation. Rather, the severe impairment requirement is a threshold element which plaintiff must prove in order to establish disability within the meaning of the Act. *Gist v. Sec'y of H.H.S.*, 736 F.2d 352, 357 (6th Cir. 1984). An impairment will be considered nonsevere only if it is a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education,

and work experience." *Farris v. Sec'y of H.H.S.*, 773 F.2d 85, 90 (6th Cir. 1985) (citing *Brady v. Heckler,* 724 F.2d 914, 920 (11th Cir. 1984)).  The severity requirement is a *"de minimus hurdle"* in the sequential evaluation process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). *See also Rogers*, 486 F.3d at 243 n.2.

The evidence of record regarding plaintiff's mental impairments consists of a 2003 consultative examination with Dr. Chiappone and his opinion that plaintiff is mildly limited by a mood and personality disorder (Tr. 254-57); the August 2003 opinion of reviewing psychologist Dr. Goldsmith that plaintiff has mild limitations due to her mental impairments (Tr. 293-305); October 2004 to February 2007 treatment notes from Samaritan Behavioral Health (Tr. 362-87, 496-543, 651-714); and the March 2006 opinion of reviewing psychologist, Dr. Chambly, that plaintiff has bipolar disorder which causes mild-to-moderate limitations.  (Tr. 622-41).  Plaintiff fails to articulate how this evidence establishes that she suffers from a severe mental impairment, asserting simply that her ongoing mental health treatment and the opinions of Dr. Chiappone, Dr. Goldsmith, and Dr. Chambly "clearly" establish the existence of a severe mental impairment.

Nevertheless, the undersigned finds that the evidence of record, specifically Dr. Chambly's findings that plaintiff has moderate difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence, or pace (Tr. 638) are sufficient to support a finding that plaintiff's mental impairment is severe insofar as it is more than a "slight abnormality" having only a "minimal effect [such] that it would not be expected to interfere with [plaintiff]'s ability to work . . . ." *Farris*, 773 F.2d at 90.  However, the ALJ's failure to deem

plaintiff's mental impairment severe is harmless error as he took it into consideration and accounted for ascribed limitations in formulating plaintiff's RFC.

Under the Social Security Regulations, once the ALJ determines a claimant has at least one severe impairment, the ALJ must consider all impairments, severe and non-severe, in the remaining steps of the sequential evaluation process. 20 C.F.R. § 404.1545(e). If an ALJ considers all of a claimant's impairments (both severe and non-severe) in determining the claimant's RFC, the ALJ's failure to characterize additional impairments as "severe" is not reversible error. *See Glenn v. Astrue,* Case No. 3:09-cv-296, 2010 WL 4053548, at *14 (S.D. Ohio Aug. 13, 2010) (citing *Maziarz v. Sec'y of H.H.S,* 837 F.2d 240, 244 (6th Cir. 1987)), *adopted,* 2010 WL 4053549 (S.D. Ohio Oct. 14, 2010) (Black, J.). As this Court has previously determined:

> In other words, if an ALJ errs by not including a particular impairment as an additional severe impairment in step two of his analysis, the error is harmless as long as the ALJ found at least one severe impairment, continued the sequential analysis, and ultimately addressed all of the claimant's impairments in determining his residual functional capacity.

*Meadows v. Commissioner of Soc. Sec.,* No. 1:07cv1010, 2008 WL 4911243, at *13 (S.D. Ohio Nov. 13, 2008) (Barrett, J.) (citing *Swartz v. Barnhart,* 188 F. App'x. 361, 368 (6th Cir. 2006); *Maziarz,* 837 F.2d at 244).

Here, the ALJ found at Step Two of the sequential evaluation that plaintiff had the following severe impairments: chronic neck and low back pain; chronic bilateral shoulder pain (worse on the left side); and obesity. Plaintiff's claim then proceeded to Steps Three through Five of the sequential evaluation process, at which point the ALJ was required to consider both

19

severe and non-severe impairments. *Anthony v. Astrue*, 266 F. Appx. 451, 457 (6th Cir. 2008). The ALJ's decision contains an extensive discussion of the medical evidence of record relating to plaintiff's mental health treatment and he accounted for Dr. Chambly's opinion that plaintiff had moderate difficulties in maintaining concentration, persistence, or pace by including a limitation in her RFC that she not be required to maintain concentration on a single task for longer than fifteen minutes at a time. Hence, the ALJ's failure to find that plaintiff suffers from a severe mental impairment is harmless error as he ultimately addressed the impairment in formulating the RFC. *Swartz*, 188 F. App'x. at 368; *Maziarz*, 837 F.2d at 244. Accordingly, plaintiff's first assignment of error should be overruled.

2. The ALJ did not err in weighing the medical opinions of record or in formulating plaintiff's RFC.

Plaintiff contends the ALJ erred in rejecting the opinion of Dr. Gomaa, plaintiff's treating pain specialist, and in failing to properly account for limitations provided by consultative examiner Dr. Vitols, namely that plaintiff cannot carry on work-related activities and use of the left arm, in formulating plaintiff's RFC. Plaintiff argues that the opinion of Dr. Gomaa should have been given great deference, if not controlling weight, as she has a long treatment history with plaintiff and her opinion is consistent with the objective medical evidence. Further, plaintiff asserts the ALJ erred by failing to appropriately consider the portion of Dr. Vitols' opinion regarding her inability to do work activities with her left arm. Plaintiff's arguments are not well-taken.

"In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997). Likewise, a treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Sec'y of H.H.S.,* 708 F.2d 1048, 1054 (6th Cir. 1983). The weight given a treating physician's opinion on the nature and severity of impairments depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. §§ 404.1527(c), 416.927(c)[4]; *Harris*, 756 F.2d 431 (6th Cir. 1985). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Walters*, 127 F.3d at 530. If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference. *Harris*, 756 F.2d at 435. *See also Cohen v. Sec'y of H.H.S.*, 964 F.2d 524, 528 (6th Cir. 1992). The opinion of a nonexamining physician is entitled to little weight if it is contrary to the opinion of the claimant's treating physicians. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). If the ALJ rejects a treating physician's opinion, the ALJ's decision must be supported by a sufficient basis which is set forth in his decision. *Walters*, 127 F.3d at 529; *Shelman*, 821 F.2d at 321.

---

[4] Regulations 20 C.F.R. §§ 404.1527 and 416.927 were amended effective March 26, 2012. The provisions governing the weight to be afforded a medical opinion were previously found at §§ 404.1527(d) and 416.927(d).

If the ALJ does not give the treating source's opinion controlling weight, then the ALJ must consider a number of factors when deciding what weight to give the treating source's opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c). These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. §§ 404.1527(c)(2)(i)(ii), 416.927(c)(i)(ii); *Wilson,* 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(3)-(6), 416.927(c)(3)-(6); *Wilson,* 378 F.3d at 544. The ALJ must likewise apply the factors set forth in § 404.1527(c)(3)-(6) and § 416.927(c)(3)-(6) when considering the weight to give a medical opinion rendered by a non-treating source. 20 C.F.R. §§ 404.1527(c), 416.927(c). When considering the medical specialty of a source, the ALJ must generally give "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5).

Plaintiff argues the ALJ "erred in rejecting the opinion of the treating specialist [Dr. Gomaa] and the opinion of the consultative examiner, Dr. Aivars Vitols, that the claimant does not have [the RFC] to carry on work related activities." (Doc. 9, p. 2). The scope of plaintiff's argument is limited to whether the ALJ appropriately weighed the opinions of Dr. Gomaa and Dr. Vitols; accordingly, the Court will limit its analysis to this discrete issue.[5] The

_____

[5] Plaintiff's failure to present a developed argument regarding how the ALJ weighed the other medical opinions of record amounts to a waiver. *See McPherson v. Kelsey,* 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues

Commissioner asserts that the ALJ's decision should be upheld as he properly discounted the portion of Dr. Gomaa's opinion that was inconsistent with the record as a whole and incorporated the limitations provided by Dr. Vitols in formulating plaintiff's RFC.

The record demonstrates that the ALJ considered the relevant factors in his determination that Dr. Gomaa's opinion was not entitled to controlling or deferential weight. 20 C.F.R. §§ 416.927(c), 404.1527(c). The ALJ's decision noted that Dr. Gomaa was plaintiff's treating pain specialist since 2004. However, despite this specialty area and treatment history, the ALJ reasonably determined that Dr. Gomaa's February 2008 opinion that plaintiff could sit, stand, and walk in combination no longer than four hours of the work day was "far too restrictive and not well-supported by the progress notes, most of which showed generally intact neurological functions and improved functioning in daily activities with treatment." (Tr. 26).

In this case, the ALJ was faced with inconsistent and contradictory evidence. Plaintiff correctly notes that the record contains objective findings of multilevel degenerative disc disease of the cervical spine (Tr. 361, 420, 459, 901), tendon tears of both shoulders (Tr. 904, 906), moderate lateral cord compression of the cervical spine at C7 (Tr. 288-90), and C7 cervical radiculopathy (Tr. 268) which support Dr. Gomaa's opinion.[6] Yet, the abnormal findings cited by plaintiff largely relate to plaintiff's neck and left arm issues. Further, the record contains inconsistent findings with respect to plaintiff's spinal impairments. For example, the March

---

adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

[6] Plaintiff incorrectly asserts that the ALJ failed to mention positive EMG findings for radiculopathy. (Doc. 9, p.3). A review of the record demonstrates that the ALJ specifically considered EMG evidence of radiculopathy in determining that plaintiff's neck, back, and shoulder pain were severe impairments. *See* Tr. 21.

2003 MRI of plaintiff's cervical spine revealed no acute compression deformity (Tr. 265); the July 2003 MRI indicated only mild-to moderate degenerative changes of the cervical spine (286); and the October 2006 MRI of the thoracic spine revealed moderate to severe disc protrusion at T7-T8 but all other findings were mild. (Tr. 562-63). In addition, the most recent MRI of the lumbar spine indicates that plaintiff had no disc herniations or stenosis. (Tr. 958). Further, the clinical evidence of record includes findings that plaintiff: had full upper extremity strength bilaterally (Tr. 268, 334), normal upper and lower extremity reflexes (Tr. 426, 479-80), and both limited and normal spinal range of motion (Tr. 455, 465, 875); could ambulate and heel-toe walk without difficulty (Tr. 278, 937); and had negative and positive straight leg raising. (Tr. 426, 763-64, 826-28, 937). The record also includes the opinion of a neurosurgeon, Dr. West, that plaintiff's condition was not severe enough to warrant surgery and could be treated with conservative care (Tr. 390) and, further, reflects that while plaintiff was noted as improving with physical therapy, she discontinued the treatment. (Tr. 318-19, 325-31).

While Dr. Gomaa's opinion was that plaintiff was restricted to standing and walking for two hours a day and to sitting for no more than four hours a day, Dr. Vitols opined that plaintiff could stand and walk six hours a day and was unlimited in her ability to sit. Indeed, plaintiff did not describe any difficulty with prolonged periods of sitting when examined by Dr. Vitols. (Tr. 935). In weighing these opinions, the ALJ decided to give greater weight to the opinion of Dr. Vitols, noting that it "is generally supported by the 2003 and 2006 functional evaluations of . . . Dr. Cho, Dr. Torello, and Dr. Gahman, all of whom reviewed the medical evidence and proposed a limited light physical capacity for [plaintiff]." (Tr. 26). The ALJ also noted that his decision

to give Dr. Vitols' opinion greater weight was based on its compatibility with the majority of the progress notes from Dr. Gomaa's pain clinic, which show that plaintiff has had a generally positive response to therapy. Moreover, the ALJ identified that he gave considerable deference to Dr. Vitols' opinion due to his expertise in orthopedic surgery and the fact that he had recently examined plaintiff. It is the ALJ's function to resolve inconsistencies and conflicts in the medical evidence, *see King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984), and the record reveals that the ALJ properly considered the totality of the evidence in the record in weighing the opinions of Dr. Gomaa and Dr. Vitols in assessing plaintiff's RFC.

Contrary to plaintiff's assertion that the ALJ failed to consider Dr. Vitols' opinion that plaintiff lacked the residual capacity to carry on work-related activities with the left arm, the record demonstrates that the ALJ considered this limitation in formulating plaintiff's RFC. Notably, Dr. Vitols did not opine that plaintiff had no use whatsoever of her left arm but, rather, that plaintiff was limited to occasionally lifting five to 10 pounds and was unable to use her left arm above shoulder height. (Tr. 938). The ALJ accounted for this limitation in formulating plaintiff's RFC which limits her to "occasional lifting of no more than five-to-ten pounds with the nondominant left hand . . . [and] no work above shoulder level . . . ." (Tr. 24-25). While there is ample evidence of record documenting plaintiff's history of severe back, neck, and shoulder impairments, the ALJ's decision properly considered the entirety of the record and the ALJ provided valid reasons supported by specific references to the medical evidence for his decision to give greater weight to Dr. Vitols' opinion than to Dr. Gomaa's opinion as required by the applicable rules and regulations. Notably, where there is both substantially conflicting

25

medical evidence as well as substantial evidence supporting a finding of disability, the Commissioner's resolution of the conflict will not be disturbed by the Court. *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983).

Accordingly, the undersigned finds that plaintiff's second assignment of error should be overruled.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED** and this matter be closed on the docket of the Court.

Date: 7/31/2012

Karen L. Litkovitz
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

J. DAWN ISON,                                               Case No. 1:11-cv-470
     Plaintiff,                                          Dlott, C.J.
                                                Litkovitz, M.J.

     vs

COMMISSIONER OF
SOCIAL SECURITY,
     Defendant.

**NOTICE**

     Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.   This period may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).